UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA K. RETTZO, | ) | CIVIL ACTION NO. 1:19-CV-880 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| ANDREW SAUL,[1] | ) | |
| Defendant | ) | |

<u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

Plaintiff Lisa K. Rettzo, an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g).

This matter is before me, upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 9). After reviewing the parties' briefs, the Commissioner's final decision, and the relevant

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. He is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* Section 205(g) of the Social Security Act, 42 U.S.C. §405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).  The caption in this case is amended to reflect this change.

Page 1 of 45

portions of the certified administrative transcript, I find the Commissioner's final decision is supported by substantial evidence. Accordingly, I recommend that the Commissioner's final decision be AFFIRMED.

## II.   BACKGROUND & PROCEDURAL HISTORY

On October 30, 2016, Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act. (Admin. Tr. 52).  In this application, Plaintiff alleged she became disabled as of May 13, 2013, when she was forty-five years old, due to the following conditions: epilepsy, chronic pain syndrome, back injury, osteoarthritis (hip), and gastroesophageal reflux disease. (Admin. Tr. 259). Plaintiff alleges that the combination of these conditions affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember/memorize, complete tasks, concentrate, understand, and follow instructions. (Admin. Tr. 271). Plaintiff has at least a high school education and is able to communicate in English. (Admin. Tr. 59).

On February 9, 2017, Plaintiff's application was denied at the initial level of administrative review. (Admin. Tr. 52). On February 21, 2017, Plaintiff requested an administrative hearing. *Id.*

On April 3, 2018, Plaintiff, assisted by her counsel, appeared and testified during a hearing before Administrative Law Judge Scott M. Staller (the "ALJ"). (Admin. Tr. 60). On August 14, 2018, the ALJ issued a decision denying Plaintiff's

application for benefits. *Id*. On August 27, 2018, Plaintiff requested review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council"). (Admin. Tr. 236). Along with her request, Plaintiff submitted new evidence that was not available to the ALJ when the ALJ's decision was issued. (Admin. Tr. 10-48).

On May 1, 2019, the Appeals Council denied Plaintiff's request for review. (Admin. Tr. 1).

On May 22, 2019, Plaintiff initiated this action by filing a Complaint. (Doc. 1). In the Complaint, Plaintiff alleges that the ALJ's decision denying the application is not supported by substantial evidence, and improperly applies the relevant law and regulations. (Doc. 1, ¶¶ 18-31). As relief, Plaintiff requests that the Court reverse the Commissioner's final decision and award benefits, or in the alternative grant any other such relief as is justified. (Doc. 1).

On July 29, 2019, the Commissioner filed an Answer. (Doc. 4). In the Answer, the Commissioner maintains that the decision holding that Plaintiff is not entitled to disability insurance benefits was made in accordance with the law and regulations and is supported by substantial evidence. (Doc. 4, ¶ 13). Along with his Answer, the Commissioner filed a certified transcript of the administrative record. (Doc. 5).

Plaintiff's Brief (Doc. 12) and the Commissioner's Brief (Doc. 13) have been filed. Plaintiff did not file a reply. This matter is now ripe for decision.

Page 3 of 45

## III.   STANDARDS OF REVIEW

### A.   SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

"In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). The question before this Court, therefore, is not whether Plaintiff is disabled, but whether the Commissioner's finding that Plaintiff is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

B.   STANDARDS GOVERNING THE ALJ'S APPLICATION OF THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also*

20 C.F.R. § 404.1505(a).[2] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations

---

[2] Throughout this Report, I cite to the version of the administrative rulings and regulations that were in effect on the date the Commissioner's final decision was issued. In this case, the ALJ's decision, which serves as the final decision of the Commissioner, was issued on August 14, 2018.

caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. § 404.1545(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512(a); *Mason*, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. § 404.1512(b)(3); *Mason*, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was

accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Id.* at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

## IV.   DISCUSSION

Plaintiff raises the following issues in her statement of errors:

(1)   Whether the Administrative Law Judge erred and abused his discretion by failing to properly consider the limitations in Plaintiff's residual functional capacity from her myofascial hip pain, chronic pain syndrome, osteoarthritis of both knees, and epilepsy, all of which were determined to be severe impairments?

(2)   Whether the Administrative Law Judge erred and abused his discretion in failing to consider the limitations in Plaintiff's residual functional capacity with regards to her bilateral shoulder pain, lower and upper back pain, cognitive impairment, anxiety and cognitive deficits, which were not mentioned by the Administrative Law Judge in his decision, and in failing to develop the record, in particular, regarding Plaintiff's cognitive impairments?

(3)   Whether the Administrative Law Judge erred and abused his discretion in setting forth his determination of Plaintiff's residual functional capacity in light of (1) the opinion from Dr. Mark Folk, her primary care physical who completed a Residual Functional Capacity Evaluation and (2) the Functional Capacity Evaluation as opposed to the opinion of the state agency medical consultant?

(4)   Whether the Administrative Law Jude erred and abused his discretion in failing to consider the Plaintiff's use of a cane in her right dominant hand and the effect upon Plaintiff's residual functional capacity.

(Doc. 12, pp. 1-2).

A.     THE ALJ'S DECISION DENYING PLAINTIFF'S APPLICATION

In his August 2018 decision, the ALJ found that Plaintiff met the insured status requirement of Title II of the Social Security Act through September 30, 2016. (Admin. Tr. 54). Then, Plaintiff's application was evaluated at steps one through five of the sequential evaluation process.

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity at any point between October 21, 2014 (Plaintiff's alleged onset date) and September 30, 2016 (Plaintiff's date last insured) ("the relevant period"). (Admin. Tr. 55). At step two, the ALJ found that, during the relevant period, Plaintiff had the following medically determinable severe impairments: myofascial hip pain, chronic pain syndrome, osteoarthritis of both knees, and epilepsy. *Id*. The ALJ did not note the presence of any non-severe or non-medically determinable impairments. At step three, the ALJ found that, during the relevant period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*.

Between steps three and four, the ALJ assessed Plaintiff's RFC. The ALJ found that, during the relevant period, Plaintiff retained the RFC to engage in sedentary work as defined in 20 C.F.R. § 404.1567(a) except:

> She is limited to occasionally climbing ramps or stairs. She can never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, or crawl.

(Admin. Tr. 55).

At step four, the ALJ found that Plaintiff had no past relevant work. (Admin. Tr. 59). At step five, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC Plaintiff could engage in other work that existed in the national economy. (Admin. Tr. 59). To support his conclusion, the ALJ relied on testimony given by a vocational expert during Plaintiff's administrative hearing and cited the following three (3) representative occupations: final assembler, optical goods (DOT #713.687-018; order clerk, food and beverage (DOT #209.567-014); and dowel inspector (DOT #669.687-014). (Admin. Tr. 60).

B.   WHETHER THE ALJ FAILED TO ACCOUNT FOR THE CREDIBLY ESTABLISHED LIMITATIONS RESULTING FROM PLAINTIFF'S MEDICALLY DETERMINABLE IMPAIRMENTS

As discussed above, a claimant's RFC is defined as "the most [a claimant] can still do despite [his or her] limitations," taking into account all of a claimant's medically determinable impairments. 20 C.F.R. § 404.1545. In making this assessment, the ALJ is required to consider the combined effect of all medically determinable impairments, both severe and non-severe. *Id.* Although such challenges most often arise in the context of challenges to the sufficiency of vocational expert testimony, the law is clear that an RFC assessment that fails to take all a claimant's credibly established limitations into account is defective. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n. 8 (3d Cir. 2005) (noting that an

argument that VE testimony cannot be relied upon where an ALJ failed to recognize credibly established limitations during an RFC assessment is best understood as a challenge to the RFC assessment itself); *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 147 (3d Cir. 2007) (noting that an ALJ must include in the RFC those limitations which he finds to be credible).

Moreover, because an ALJ's RFC assessment is an integral component of his or her findings at steps four and five of the sequential evaluation process, an erroneous or unsupported RFC assessment undermines the ALJ's conclusions at those steps and is generally a basis for remand.

        1.     The ALJ's Evaluation of Plaintiff's Non-Exertional Limitations

Plaintiff argues:

> **<u>First, as noted herein previously, despite the existence of mental-health related impairments, cognitive impairments, and a seizure disorder/ epilepsy, the ALJ included no non-exertional limitations in setting forth Claimant's RFC</u>**. Specifically, the ALJ failed to consider several of the documented and diagnosed issues regarding Claimant's mental health, in terms of her non-exertional limitations and the effects upon Claimant's residual functional capacity, despite some treatment notes noting issues with anxiety and focus (Admin. Tr. 67). Claimant's testimony regarding her mental health issues and seizures (which she states are still absence type, and occur several times per week), and the limitations related thereto, is consistent with the issues noted upon treatment, and despite this, the ALJ provides no non-exertional limitations in his statement regarding Claimant's RFC, and therefore it is insufficient to address these limitations, particularly regarding Claimant's ability to remain on task, need for unscheduled breaks, and expected absenteeism due to the issues with her seizure episodes and her mental health issue. (Admin. Tr. 145 and 520).

Claimant's husband confirmed the frequent absence-type seizures, which Claimant may not even be aware of, which occur at least three (3) times per week (as many as five to six times per week if Claimant's husband is home from work all day to see more of them), and that these episodes have been consistently occurring since 2014. (Admin. Tr. 159-160). In particular, the ALJ fails to address how the ongoing issues related to Claimant's mental health, cognitive impairments, and seizure disorder/ epilepsy would impact her ability to remain on task, need for unscheduled breaks, and absenteeism. Despite addressing all three issues with the Vocational Expert, there is nothing in the ALJ's decision to reflect consideration of these factors. (Admin. Tr. 163-164).

(Doc. 12, pp. 13-14) (emphasis in original) (footnote omitted).

In response, the Commissioner argues:

As mentioned in the introduction, the ALJ correctly noted that treatment reports for epilepsy show that:

- In February 2013, it was under excellent control (Tr. 56, referring to Tr. 295).

- In February 2014, Plaintiff continued to do "extremely well" with no seizures and no absence events, myoclonic, or generalized tonic-clonic seizures (Tr. 56, referring to Tr. 338).

- Reports from February 2015 and February 2016 confirm that Plaintiff remained seizure-free, with no absence events, myoclonic, or generalized tonic-clonic seizures; she walked without tremor or ataxia; she retained full motor strength in all extremities; and no medications changes were needed as Plaintiff's seizures were under excellent control (Tr. 56, referring to Tr. 359-60, 363-64, 376-77, 489-90, 466-67).

Although Plaintiff and her husband stated that Plaintiff experienced staring spells (Tr. 158-60), this claim was not even documented in a medical report until March 20, 2017 (Tr. 520), which is several months after Plaintiff's insured status expired. Thus, it is not relevant to the period at issue.

Page 12 of 45

(Doc. 13, pp. 15-16).

At the outset, I note that the ALJ properly excluded limitations resulting from an anxiety-related disorder because he found it not medically determinable and properly excluded limitations from a cognitive impairment because this impairment was not alleged by Plaintiff or presented in the medical records given to the ALJ. *See* Section IV. C. of this Report. Accordingly, I am not persuaded by Plaintiff's argument that remand is required for further consideration of limitations relating to these impairments.

Epilepsy, however, was found to be medically determinable and severe. The ALJ was required to account for the credibly established limitations that result from epilepsy in the RFC assessment. When he assessed Plaintiff's epilepsy, the ALJ noted:

> The claimant's medical history shows that she has a longstanding history of primary generalized epilepsy since she was approximately 13 years old. In February 2013, the epilepsy was under "excellent control" with the use of divalproex sodium sprinkles (Exhibit 1F, 7-8). Follow-up in February 2014 showed that the claimant continued to do "extremely well" with no seizures. She had no absence events, myoclonic, or generalized tonic-clonic seizures (Exhibit 1F, 51).
>
> Medical reports from February 2015 and February 2016 show that the claimant remained seizure-free, with no absence events, myoclonic, or generalized tonic-clonic seizures. Examinations show no tremor or ataxia with ambulation. She had full motor strength in the upper and lower extremities. Since the claimant's seizures were under excellent control, no changes in medication were made (Exhibit 1F, 72-73, 89-90).

. . . .

> The claimant's husband, Harry Reltzo [sic], also testified. He stated that he has observed "staring off" episodes. These episodes occur about three times a week (Hearing Testimony). However, the medical record during the adjudicative period specifically notes that she did not have absence events. Treatment notes only begin mentioning staring spells in March 2017, nearly six months after the expiration of her insured status (Exhibit 6F, 18).

(Admin. Tr. 56, 58).

Plaintiff essentially argues that her husband's testimony should be given more weight than the contemporaneous treatment records written by the medical source treating her epilepsy. The regulations governing an ALJ's consideration of opinions by non-medical sources, like Plaintiff's husband, provide that in deciding what weight to accord to the testimony, the ALJ should use the following factors (to the extent they are relevant): length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention.  20 C.F.R. § 404.1527(c). Here, the ALJ accurately concluded that Plaintiff's husband's testimony was not consistent with the record and discounted it. This is a proper basis to discount this testimony, and it is supported by the record. Therefore, I find that

Page 14 of 45

the ALJ did not err by discounting this testimony and excluding any limitation related to Plaintiff's seizures, because the medical evidence from that period states that Plaintiff was not having any seizures or absence events.

   2.   The ALJ's Evaluation of Plaintiff's Exertional Limitations

Plaintiff argues:

The ALJ failed to properly consider the real limitations from Claimant's physical impairments, which are noted in her treatment records, which the ALJ noted as not being significantly limiting with regards to Claimant, as the ALJ states that Claimant's medical records all reveal normal findings. This finding by the ALJ is contrary to treatment records well into 2016, which documented continued treatment sought by Claimant as noted therein, as follows: (1) complaints of ongoing and severe bi-lateral knee pain, unresolved despite multiple injections, (2) ongoing hip pain, with the need for additional surgery, (3) notations reflecting abnormal gait, (4) diagnostic studies showing severe patellofemoral chondrosis, (5) episodes where her knee locks, (6) trouble going up and down steps and getting up from a seated position due to pain, (7) pain down from her hip, down her leg, and to her foot, and (8) that she uses a Fentanyl patch, which causes a severe side effect and makes her very tired and drowsy. (Admin. Tr. 131, 294, 338, 345, 348, 351, 359, 363, 376, 403, 409-411, 438, 446-448, 461, 473, 478 and 484). The records are however consistent regarding Claimant's indication that these conditions continue to cause severe pain, and are limiting in nature, which keep her from returning to work, as Claimant's testimony regarding her physical restrictions and issues related to pain were consistent with the complaints reflected in her medical records, particularly when referring to (1) years of bilateral hip pain, which causes her to shift weight and makes her constant knee pain worse, (2) she has side effects from her medications that make her drowsy, (3) she needs help with ADLs, such as dressing bathing, due to pain, (4) she sleeps during the day, due to issues with fatigue, sleep, and side effects from medications, (5) she is limited in her ability to do chores, due to pain and balance issues, (6) her left knee gives out, and she sometimes falls, (7) her knee pain effected [sic] her ability to sit and

stand while she was working, and (8) she sits with her legs elevated to alleviate the pain in her knees. (Admin. Tr. 144-148, 151-155, 160-161, and 268).

The ALJ offers no limitations concerning Claimant's ability to sit, stand or walk, despite the above, event [sic] though a result of her pain, Claimant spends most of the day laying down, or in a reclined position in her recliner. (See above). Clearly, Claimant cannot be in this position while performing sedentary work, or any type of work, and maintain employment.

(Doc. 12, pp. 15-16).

In response, the Commissioner argues:

As for Plaintiff's low back and hip pain, the ALJ correctly noted that:

- On September 16, 2014, Plaintiff complained of back pain into her hips, but could still walk with a normal gait, had no tenderness to palpation of the spine, and had only mildly reduced range of motion in her lumbar spine (Tr. 56, referring to Tr. 353).

- On October 21, 2014, Plaintiff's treating physician reported that Plaintiff was doing better, her back was improved, and she walked with only a slightly antalgic gait (Tr. 56, referring to Tr. 355).

Turning to Plaintiff's left knee, the ALJ correctly noted that:

- Plaintiff had injections on October 21, 2014 and March 6, 2015 and that the October injection worked for four or five months (Tr. 57, referring to Tr. 403, 484).

- On April 24, 2015, Dr. Folk commented that Plaintiff was "doing well" and walked with only a slightly antalgic and asymmetrical gait (Tr. 57, referring to Tr. 365-66).

- Plaintiff went until August 31, 2015 to receive another left knee injection and at that time, she walked with a normal gait (Tr. 57, referring to Tr. 478).

- The August 2015 injection relieved symptoms until mid-December 2015 and Plaintiff did not receive another injection until January 11, 2016 (Tr. 57, referring to Tr. 473).

- On April 26, 2016, Dr. Folk again reported that Plaintiff was "doing well" and had normal musculoskeletal and neurological systems - including a normal gait - and that there was no evidence of any decline in Plaintiff's condition prior to September 30, 2016, when her insured status expired (Tr. 57, referring to Tr. 380-81).

Furthermore, the ALJ went outside the relevant period and correctly noted that one month after Plaintiff's insured status expired, she was doing well and walked with a normal gait (Tr. 57, referring to Tr. 383). Even beyond the fall of 2016, the record shows good results from knee treatment with Plaintiff's treating orthopedic surgeon reporting in 2018 that Plaintiff "had a corticosteroid injection in her left knee in 2016, which lasted for over a year" (Tr. 513).

(Doc. 13, pp. 16-17).

Plaintiff argues that the ALJ offered "no limitations concerning Claimant's ability to sit, stand or walk." I disagree. In his decision, the ALJ found that Plaintiff was limited to sedentary work. The Commissioner's regulations define sedentary work as:

Lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). SSR 83-10 offers additional clarification as to the requirement of sedentary work. It provides, in relevant part that:

Page 17 of 45

> The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
>
> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

1993 WL 31251 at *5. Thus, by limiting Plaintiff to "sedentary" work, the ALJ found that Plaintiff would be able to sit for approximately 6 hours per day and stand and/or walk for up to two hours per day. I am not persuaded that remand is required because the ALJ did not impose any limits to sitting, standing, or walking.

Next, Plaintiff suggests that the ALJ should have credited her testimony that she must be permitted to elevate her legs. During her administrative hearing, Plaintiff made the following statements about her need to maintain a reclined position with legs elevated:

> Q     Okay. And when the Judge asked you about how you spend your day, you said you go to a recliner, why do you sit in a recliner?
>
> A     Because it's the easiest thing to do.

Q     Okay. What—are you legs up, do you have—are you reclining when you sit in the recliner?

A     Correct.

Q     Why?

A     Because my legs have to be elevated because it—it alleviates some of the pain for me

(Admin. Tr. 155). It appears that Plaintiff spends most of her day in a reclined position with legs elevated to alleviate knee pain. Plaintiff essentially argues that this testimony should have been credited and incorporated in the ALJ's RFC assessment.

The Commissioner's regulations define "symptoms" as the claimant's own description of his or her impairment. 20 C.F.R. § 404.1502; SSR 96-4p, 1996 WL 374187. A symptom, however, is not a medically determinable impairment, and no symptom by itself can establish the existence of such an impairment. SSR 96-4p, 1996 WL 374187. The ALJ is not only permitted, but also required, to evaluate the credibility of a claimant's statements about all symptoms alleged and must decide whether and to what extent a claimant's description of his or her impairments may be deemed credible. In many cases, this determination has a significant impact upon the outcome of a claimant's application, because the ALJ need only account for those symptoms – and the resulting limitations – that are credibly established when formulating his or her RFC assessment. *Rutherford*, 399 F.3d at 554. To facilitate this difficult analysis, the Commissioner has devised a two-step process that must

Page 19 of 45

be undertaken by the ALJ to evaluate a claimant's statements about his or her symptoms.

First, the ALJ must consider whether there is an underlying medically determinable impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the symptom alleged. 20 C.F.R. § 404.1529(b). If there is no medically determinable impairment that could reasonably produce the symptom alleged, the symptom cannot be found to affect the claimant's ability to do basic work activities. 20 C.F.R. § 404.1529(b); 20 C.F.R. § 416.929(b); SSR 96-4p, 1996 WL 374187; SSR 16-3p, 2016 WL 1119029.

Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms which can be reasonably attributed to a medically determinable impairment. 20 C.F.R. § 404.1529(c)(1). Symptoms will be determined to reduce a claimant's functional capacity only to the extent that the alleged limitations and restrictions can reasonably be accepted as consistent with objective medical evidence and other evidence of record. 20 C.F.R. § 404.1529(c)(4). However, an ALJ will not reject statements about the intensity, persistence, or limiting effects of a symptom solely because it is not substantiated by objective evidence. 20 C.F.R. § 404.1529(c)(3). Instead, the ALJ will evaluate the extent to which any unsubstantiated symptoms can be credited based on the following factors: the

Page 20 of 45

claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; any factor that precipitates or aggravates the claimant's pain or other symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her pain or other symptoms; any treatment, other than medication, the claimant receives or has received for relief of his or her pain or other symptoms; any measures the claimant uses or has used to relieve his or her pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and any other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3).

An ALJ's findings based on the credibility of a claimant are to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness's demeanor and credibility. *Frazier v. Apfel*, No. 99-CV-715, 2000 WL 288246, at *9 (E.D. Pa. Mar. 7, 2000) (*quoting Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). An ALJ is not free to discount a claimant's statements about his or her symptoms or limitations for no reason or for the wrong reason. *Rutherford*, 399 F.3d at 554.

Although the ALJ did not discuss Plaintiff's testimony about reclining and elevating her feet, he did devote considerable discussion to Plaintiff's testimony about her knee pain. Specifically, the ALJ pointed out that during the relevant period

Plaintiff was observed to walk normally and only had a "slightly antalgic gait" in October 2014 and April 2015. (Admin. Tr. 57). Plaintiff was noted to have a full range of motion in her knee and responded well to injections. *Id.* Ultimately, the ALJ concluded that Plaintiff's statements about the intensity, persistence or limiting effects of her knee pain were not entirely consistent with the evidence. This conclusion appears to be supported by the record, and Plaintiff has cited no evidence that undermines that support. Accordingly, I am not persuaded that remand is required for further consideration of whether the ALJ should have included a requirement that Plaintiff be permitted to work from a reclined position with her legs elevated.

C.   WHETHER THE ALJ'S EVALUATION OF PLAINTIFF'S IMPAIRMENTS AT STEP TWO IS SUPPORTED BY SUBSTANTIAL EVIDENCE

At step two of the sequential evaluation process, the ALJ considers whether a claimant's impairment is (1) medically determinable or non-medically determinable, and (2) severe or non-severe; this step is essentially a threshold test.  20 C.F.R. § 404.1520(a)(4)(ii); SSR 85-28, 1985 WL 56856.

To be found medically determinable, an impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1521; *see also* 20 C.F.R. § 404.1502 (defining objective medical evidence,

laboratory findings, and signs). This means that, to be considered, an impairment must be established by objective medical evidence from an acceptable medical source. A claimant's statement of symptoms, a diagnosis that is not supported by objective evidence, or a medical opinion not supported by objective evidence, is not enough to establish the existence of an impairment. *Id.*; SSR 16-3p, 2017 WL 5180304, at *2 ("Under our regulations, an individual's symptoms alone are not enough to establish the existence of a physical or mental impairment or disability."); *see also* 20 C.F.R. § 404.1502(i) (defining symptoms). A claimant's symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect a claimant's ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment is present. 20 C.F.R. § 404.1529(b). Thus, non-medically determinable impairments are excluded from an ALJ's RFC assessment.

When she filed her application, Plaintiff did not allege the existence of any cognitive impairment, but did allege impairment due to a "back injury." (Admin. Tr. 259) (alleging disability due to epilepsy, chronic pain syndrome, back injury, osteoarthritis (hip), and gastroesophageal reflux disease). Plaintiff did not allege that she suffered from any kind of mental impairment during the administrative hearing. Plaintiff did testify that she could not vacuum because it used "too many muscles" in her back. (Admin. Tr. 148).

At step two of his decision, the ALJ did not address whether Plaintiff had a back impairment or mental impairment. (Admin. Tr. 55) (identifying the following medically determinable impairments: myofascial hip pain, chronic pain syndrome, osteoarthritis of both knees, and epilepsy).

Although the ALJ did not evaluate a specific back-related impairment at step two, he discussed Plaintiff's back pain as follows in the RFC assessment:

> Treatment notes by Dr. Mark Folk from September 16, 2014 show that the claimant had complaints of ongoing pain from the mid-thoracic spine down to the low lumbosacral spine and into both hips. Upon examination, she walked with a normal gait and there was no tenderness to palpation of the spine. Range of motion was mildly reduced in the lumbar spine. She was assessed with chronic pain syndrome. The claimant declined physical therapy but indicated that she might try deep tissue massage (Exhibit 1F, 66).
>
> The following month, the claimant was doing better. Her lumbago improved. Treatment notes by Dr. Folk from October 24, 2014 show that the claimant walked with a slightly antalgic gait. The remainder of the examination was unremarkable (Exhibit 1F, 68-69).

(Admin. Tr. 56).

The ALJ also discussed whether a medically determinable mental impairment existed in the RFC section of his opinion. He found:

> there is no evidence of a medically determinable mental impairment during the adjudicative period. In fact, the claimant specifically denied psychiatric symptoms during that time and mental status screens were generally unremarkable (Exhibit 1F, 68, 70, 78-79, 87, 93-94). The undersigned finds, therefore, that any references to mental limitations prior to the expiration of the claimant's insured status are without merit.

(Admin. Tr. 58).

Plaintiff argues:

The regulations provide that a "severe" impairment is an "impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities". 20 C.F.R. §§404.1520. With respect to this threshold showing of a severe impairment, the showing required by law has been aptly described in the following terms: "In order to meet the step two severity test, an impairment need only cause a slight abnormality that has no more than a minimal effect on the ability to do basic work activities". 20 C.F.R. §§404.1521 and 20 C.F.R. §§416.921. The Third Circuit Court of Appeals has held that the step two severity inquiry is a "de minimus screening device to dispose of groundless claims." *McCrea v. Commissioner of Social Security*, 370 F.3d 357, 360 (3d Cir. 2004). "Any doubt as to whether this showing has been made is to be resolved in favor of the applicant. " *Id.* When an ALJ fails to address whether an impairment is medically determinable at step two, such an error can undermine the findings at each subsequent step of the sequential evaluation process. *Crayton v. Astrue*, No. 4:10-CV-01235, 2011 U.S. Dist. Lexis 139414, 54 (M.D. Pa. Sept. 30, 2011).

Claimant has complained of increasing upper back, lower back and hip pain, throughout her medical records, which conform treatment for these complaints of pain for a number of years. (Admin. Tr. 67, 338, 345, 351-53, 359, 363, 376, 385 and 438). Claimant's testimony confirms ongoing and significant limitations from these disorders, despite being ignored by the ALJ in his determination of Claimant's RFC, as the back pain in particular was not noted by the ALJ as being considered as part of his consideration of Claimant's RFC. Claimant also reports increased panic attacks and anxiety attacks, which coincide with increased stress, which is also not noted in considering Claimant's RFC. (Admin. Tr. 338). In Addition, despite notations in the record concerning cognitive issues (including difficulty reading, recognizing numbers, focusing, etc.) that impacted Claimant's ability to work prior to the date last insured, the ALJ made no effort to develop this record. (Admin. Tr. 67). Per HALLEX 1-2-6-56, the ALJ had an obligation to fully and fairly develop the record, which did not occur with regards to

the conditions noted above, particularly the cognitive and mental-health related issues.

Based upon the above, these conditions should have been considered, as they have more than a minimal effect upon Claimant, and should have been factored into her RFC.

(Doc. 12, pp. 17-19) (emphasis in original).

The Commissioner does not specifically address Plaintiff's contention that her back impairment was not evaluated by the ALJ.

In response to Plaintiff's allegation that she has unaddressed mental impairments, the Commissioner argues:

On the mental side, the ALJ correctly noted that Plaintiff denied having psychiatric symptoms (Tr. 58, referring to Tr. 365, 380) and that mental status examinations were generally normal (Tr. 58, referring to Tr. 355, 357, 366, 374, 381). Indeed, on April 24, 2015 and April 26, 2016, Plaintiff denied having psychiatric symptoms (Tr. 365, 380). Further, on October 24, 2014, January 13, 2015, April 24, 2015, October 23, 2015, and April 26, 2016, Dr. Folk observed that Plaintiff was alert and oriented x3 (Tr. 355, 357, 366, 374, 381). Consistent with Dr. Folk's notes, neurology notes from February 20, 2015 describe Plaintiff as being awake, alert, and able to provide detail to her own medical history; being free of aphasias or apraxias; possessing awareness without lapse; and having a full fund of knowledge with no work-finding difficulties (Tr. 359). Similarly, on August 31, 2015, Dr. Mason observed that Plaintiff was oriented to time and place and maintained a pleasant mood and normal affect (Tr. 478).

Although Plaintiff mentions limitations from a cognitive impairment, the record does not support this claim. This fact is apparent based on Plaintiff's activities of daily living, which includes driving a car (Tr. 143). Plaintiff takes prescription medications (Tr. 373). However, Dr. Folk reported that they caused "no side effects" (Tr. 373).

Page 26 of 45

What is more, the jobs that the vocational expert identified accommodate Plaintiff's alleged non-exertional limitations. As mentioned earlier, vocational expert testified that an individual with Plaintiff's limitations could manage the demands of representative unskilled, sedentary work such as final assembler, optical goods; order clerk, food and beverage; and dowel inspector (Tr. 162). These jobs are unskilled because they are listed in the Dictionary of Occupational Titles (DOT) as having with a Specific Vocational Preparation (SVP) Level of 2. See DICOT 713.687-018, 1991 WL 679271 (Final Assembler, Optical Goods); DICOT 209.567-014, 1991 WL 671794 (Order Clerk, Food and Beverage); DICOT 669.687-014, 1991 WL 686074 (Dowel Inspector). SVP refers to "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, Appendix C- Components of the Definition Trailer, 1991 WL 688702. A job with an SVP of 2 requires "[a]nything beyond short demonstration up to and including 1 month" to learn. Id. An SVP of 2 corresponds to "unskilled work" under the Commissioner's regulations. *See* SSR 00-4p, 2000 WL 1898704, at *3.

(Doc. 13, pp. 17-19).

As noted above, the ALJ found that Plaintiff had a medically determinable impairment of chronic pain syndrome. I have reviewed the relevant records cited by Plaintiff in support of her position that Plaintiff's back pain should have, but was not, considered separately from her chronic pain syndrome. (Admin. Tr. 338, 345, 351-53, 359, 363, 376, 385, 438).[3] However, in several records it appears that her

_____

[3] Plaintiff also cited to Admin. Tr. 67 in support of her argument. This record was first introduced at the Appeals Council level. It was not available to the ALJ when he issued his decision. Plaintiff has not argued, or made the requisite showing, that remand is warranted for the consideration of new evidence under sentence six of

back pain was attributed to her chronic pain syndrome. For example, in an August

26, 2014 treatment record, Dr. Folk wrote:

| | |
|---|---|
| **Assessment #1:** | 338.4 Chronic Pain Syndrome |
| Comments | : she appears to be having a hopefully temporary setback with increase in her chronic pain in lumbar spine and hips |
| **Care Plan:** | |
| Comments | : I discussed my hesitancy to increase her fentanyl. Also rec. she not take 2 benadryl for sleep every night |
| Med Current | : Meloxicam 15mg by mouth every day |
| Med New | : Meloxicam 15 mg by mouth every day |
| Follow Up | : 3 wk. if not improved |
| | |
| **Assessment #2**: | 724.2 Lumbago |
| **Care Plan:** | |
| Pat Edu | : Pated Back Exercises |
| Follow Up | : |

(Admin. Tr. 351-352). Similarly, during a September 16, 2014 follow-up, Dr. Folk

assessed:

| | |
|---|---|
| **Assessment #1:** | 338.4 Chronic Pain Syndrome |
| Comments | : She will try deep tissue massage perhaps. No further studies or medication planned which I discouraged as well. Offered PT but she declined |
| Med Discont | : Meloxicam 15mg by mouth every day |
| | |
| **Assessment #2**: | 724.5 Backache Unspec |
| **Care Plan:** | |
| Follow Up | : Keep Oct appt for f/u |

---

42 U.S.C. § 405(g). *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). This new evidence has not been considered.

(Admin. Tr. 353). During the October follow-up Plaintiff reported that her back had improved. Dr. Folk assessed:

> **Assessment #1:**   338.4 Chronic Pain Syndrome
> **Care Plan:**
> Follow Up          : 6 months
>
> **Assessment #2**:   724.2 Lumbago
> Comments          : improved
> **Care Plan:**
> Follow Up          :

(Admin. Tr. 356).

It is not clear from these records whether Plaintiff's back pain was being treated as a symptom of her chronic pain syndrome or as a standalone impairment. Faced with this lack of clarity, the ALJ appears to have concluded that the back pain was a symptom of Plaintiff's chronic pain syndrome and evaluated it as such. Because Plaintiff's back pain was discussed by the ALJ in his RFC assessment, I fail to see how the ALJ's decision not to recognize it as a standalone impairment at step two resulted in any prejudice to Plaintiff. As such, I am not persuaded that remand is required for further evaluation of Plaintiff's back pain.

Next, Plaintiff argues that the ALJ should have, but did not, recognize Plaintiff's panic attacks and anxiety in his RFC assessment. In support of her position Plaintiff relies on the following examination summary provided by Certified

Registered Nurse Practitioner Cathy D. McNew ("CRNP McNew"), who treats Plaintiff for epilepsy. CRNP McNew wrote:

> I had the pleasure of seeing Lisa for followup in Epilepsy Clinic on February 14, 2014. She was accompanied by her daughter, Erica, for today's visit. Lisa has been known to my care for a number of years with a history of a primary generalized epilepsy since approximately the age of 18. At my visit with her in February 2013, she was doing extremely well, absolutely no seizures. She has continued to do extremely well with no seizures. She has had no absence events, myoclonic, or generalized tonic-clonic seizures. She has had no complaints of double vision, blurred vision or tremor. She does continue to have some orthopedic issues and underwent a revision of the left hip arthroplasty in 2005, has continued on chronic pain medications for relief of that pain as well as back pain. She is scheduled to see Orthopedics in the very near future for again ongoing issues with the left hip and now the left knee. ***Since my visit with her a year ago, she has been under increased stress. Her mother unfortunately suffered a fractured pelvis and is on bed rest in a hospital bed at home. She has been assisting in helping to care for her mother. Lisa indicates that her mother can be very difficult psychologically and she has had increased episodes with panic attacks as well as anxiety attacks. She is able to distinguish between the two indicating that the panic attack is also associated with increased respiratory rate, whereas anxiety attack is more an episode of trembling. She does indicate both will resolve if she is able to leave the area of stressful interaction.*** Lisa continues to live at home with her husband and her daughter.

(Admin. Tr. 338) (emphasis added). I also note that that in his medical source statement, Dr. Folk identified "anxiety" as one of Plaintiff's symptoms and identified anxiety as a psychological condition that affected Plaintiff's physical condition. (Admin. Tr. 492-493). However, the record does not include any evidence in the treatment records of an anxiety diagnosis, or treatment or evaluation by a

mental health professional or medical source. As noted above, the ALJ found in the RFC portion of his decision that Plaintiff had no medically determinable mental impairment because there was no objective evidence (in the form of mental status evaluations in treatment records) documenting any psychiatric symptoms.

Although Plaintiff is correct that the ALJ did not address any limitations related to panic attacks in his RFC assessment, there is no evidence that the symptom of "panic attacks" appears to result from "anxiety"—which the ALJ found to be a non-medically determinable impairment. Thus, the ALJ properly excluded this symptom, and any limitations that result from it, from the RFC assessment.

Last, Plaintiff argues that the ALJ failed to address her "cognitive impairment" which, she contends was noted throughout the record. The only "notation" cited by Plaintiff in support of this position appears in a treatment note that was not given to the ALJ, and instead was first introduced to the Appeals Council. (Admin. Tr. 67).

There are a limited number of options open to the District Court once the Appeals Council has denied review in a Social Security case.  A District Court may affirm the decision of the Commissioner, modify the decision of the Commissioner, or reverse the decision of the Commissioner with or without a remand *based on the record that was made before the ALJ* under sentence four of 42 U.S.C. § 405(g). *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). When a claimant seeks to rely

Page 31 of 45

on evidence that was *not* before the ALJ, however, the District Court may remand "only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ." *Id.* To hold otherwise would create an incentive to withhold material evidence from the ALJ in order to preserve a reason for remand. *Id.* at 595. Plaintiff has not alleged that this "new" evidence is material or that there is good cause for failing to present it to the ALJ.

To the extent Plaintiff alleges that evidence of this impairment that was presented to the ALJ is sufficient to require consideration of this "cognitive impairment," I am not persuaded. "An ALJ is required to consider impairments a claimant says [she] has, or about which an ALJ received evidence." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (quoting *Skarbek v. Barnhart*, 390 F.3d 500 (7th Cir. 2004)). Plaintiff did not allege the existence of a cognitive impairment in her application. Plaintiff did not discuss a cognitive impairment during her administrative hearing. Plaintiff has not demonstrated that there was any evidence of the existence of a cognitive impairment in the evidence that was presented to the ALJ. Accordingly, I find that the ALJ did not err by failing to address a cognitive impairment in his decision.

D.   WHETHER THE ALJ PROPERLY EVALUATED THE MEDICAL OPINION
     EVIDENCE

The record in this case includes two medical opinions. The first was issued by

State agency medical consultant Dr. Jay Shaw ("Dr. Shaw"). The second was issued

by treating source Dr. Mark Folk ("Dr. Folk"). In addition to these two medical

opinions, exercise physiologist Andrew Bahadoor completed a functional capacity

evaluation in December of 2017.

Dr. Shaw assessed Plaintiff's physical functional capacity between May 13,

2013 and September 30, 2016 as part of the initial review of Plaintiff's application

for benefits. His opinion is based on the medical evidence of record submitted before

February 6, 2017 (the date he issued his opinion). Dr. Shaw assessed that Plaintiff

could: occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry

up to ten pounds; stand and/or walk up to six hours per eight-hour workday; and sit

for a total of six hour per eight-hour workday. Dr. Shaw provided the following

explanation in support of his opinion:

> 49 year old female alleging disability (DIB 5/13/13) from epilepsy,
> chronic back pain, back injury, arthritis of hip and GERD.

> Neurology records show claimant with primary generalized epilepsy
> with excellent control ASM.

> Records show claimant on fentanyl patch since 2013 for alleged joint
> pains and is opioid dependent at this time.

Multiple examinations since 2013 have indicated no significant clinical evidence for severe joint disease. HMC 2/19/13 ortho visit showed claimant alleging knee pain, right hip supple and pain free, normal hip strength, full ROM at left knee assessment for patellofemoral arthritis in left knee, right knee medial compartment arthritis and left hip arthritis identified on arthroscopic exam. Claimant received local steroid knee injections in 2014.

. . . .

X rays from 12/19/16 showed right total hip arthroplasty with solid periosteal reaction and mild osteoarthritis in the left hip. Exam from visit showed claimant ambulating with a reasonable gait, reasonable ROM in hips, no changes in X rays as compared with 2013, and treating source did not see findings that explain her difficulties and felt her pain probably myofascial.

GERD not disabling and MER does not support back injury.

Claimant's allegations of severe pain not consistent with the exams or the imaging studies.

(Admin. Tr. 171).

In his decision, the ALJ gave "little" weight to Dr. Shaw's opinion. In doing

so, he explained:

The State agency medical consultant, Dr. Jay Shaw, opined on February 6, 2017 that the claimant could perform a full range of light level work (Exhibit 2A). The undersigned gives little weight to the opinion of Dr. Shaw who did not have the benefit of examining claimant or listening to her testimony. The undersigned considered the testimony of the claimant about her pain and physical limitations. Giving the claimant every benefit, the undersigned finds the claimant limited to a reduced range of sedentary level work.

(Admin. Tr. 58-59).

On November 20, 2017, Dr. Folk completed a fill-in-the-blank/check-box physical residual functional capacity questionnaire detailing the Plaintiff's physical limitations as of 2013. (Admin. Tr. 492-497). Dr. Folk reported that Plaintiff was diagnosed with chronic pain, and osteoarthritis of the hip and knees. *Id.* Dr. Folk assessed that Plaintiff could: sit for up to fifteen minutes at one time, and for less than two hours during an eight-hour workday; stand up to ten minutes at one time, and for less than two hours per eight-hour workday; walk for up to one city block before experiencing severe pain, and for less than two hours per eight-hour workday; occasionally lift and carry less than ten pounds; occasionally twist and climb stairs; rarely stoop (bend); and never crouch/squat or climb ladders. *Id.* Dr. Folk opined that Plaintiff's pain would frequently interfere with attention and concentration needed to perform simple tasks, that Plaintiff would be incapable of low stress work, and that Plaintiff would need to be permitted to shift positions at will multiple times per hour. *Id.* Dr. Folk also reported that "while engaging in occasional standing/walking" Plaintiff must use a cane or other assistive device. *Id.* Dr. Folk identified the following clinical findings and objective signs in support of this opinion: "antalgic gait with cane," "emotional lability," and "anxiety." *Id.*

The ALJ gave "little" weight to Dr. Folk's opinion. In doing so, he explained:

> The clinical findings and objective signs identified by him in support of his opinion were "antalgic gait with cane, emotional lability, anxiety" (Exhibit 4F, 1). Only twice during the adjudicative period did

Page 35 of 45

> Dr. Folk note that the claimant had a "slightly antalgic gait." Otherwise, her gait was normal and clinical findings were negative. The most recent treatment note by Dr. Folk prior to the expiration of her insured status showed that the claimant was "doing well" and an examination was "without abnormal findings" (Exhibit 1F, 93-94). There is no evidence of any decline in the claimant's condition prior to the expiration of her insured status on September 30, 2016. Even a month after the expiration of her insured status Dr. Folk reported that the claimant was still doing well with no new problems; she continued to have a normal gait and the remainder of her examination was unremarkable (Exhibit 1F, 96).

(Admin. Tr. 58).

On December 11, 2017, Plaintiff was examined by Exercise Physiologist Bahadoor ("EP Bahadoor"). After administering a battery of physical tests, EP Bahadoor assessed that Plaintiff could engage in sedentary work. In support of this conclusion he explained:

> Mrs Rettzo was pleasant and cooperative during this evaluation. She stood for a total of 12 minutes continuously and was able to sit for a total of 50 minutes in a fully reclined chair position. During the injury interview, she did state this was her preferred position for minimal discomfort however during the seated fine and gross manipulation activities, she was able to sit in the same chair without it being reclined and toward the edge of it with no back support for 10 minutes with no demonstrations or reports of difficulty.

> When using the Dynamometer for the gross manipulation activity, Mrs Rettzo completed the first trial for both left and right hand with no reports of difficulty. For the second trial, Ms. Rettzo grimaced on most of the repetitions and appeared to struggle to generate force. The third trial she grimaced and grunted on every repetition and appeared to be extremely exhausted, fatigued and nearly unable to generate any force—see report trial 3 results.

Mrs. Reetzo [sic] was very slow in getting up to a standing position to start the squat activity. She winced heavily and required the use of her cane to get up. When up, she was able to complete a total of 4 partial squats, gasping during her descent for 3 of the repetitions. She appeared to be in a lot of pain and terminated the 60 second activity at 32 seconds. She stated she needed to stop immediately sat down (in reclined chair) and continued grimacing until she felt like she recovered.

Mrs Rettzo was able to complete the reaching activity with both arms raised at chest height for 5 minutes with no reports or demonstration of difficulty. During this task using the pegboard, Mrs Rettzo appeared enthused. During the injury interview, she did state that the shoulder rehab through physical therapy helped her a lot.

Using the chair for support, Mrs Rettzo attempted the kneeling activity. With heavy wincing and grunting to get into position, she appeared to be in pain. When in a kneeling position she did state that 'pressure on the knees is causing pain' however she attempted the dynamic crawling activity, moving very slowly, whining and grunting with every movement demonstrating severe pain behavior. Following the activity, Mrs Rettzo did have tears in her eyes and expressed the difficulty of that task.

For the floor to waist with rotation lift, Mrs Rettzo displayed very poor form (completely rounding her back with straight legs) and difficulty. She was able to lift a total of 14lbs (= 2 repetitions). The second repetition appeared to require tremendous effort. Following this activity Mrs Rettzo again had tears. Her pre and post heart rate (78/116) reflected a good effort was given. In contrast, the waist to shoulder with rotation lift had a lower post heart rate than pre (89/76). A total of 14 lbs was lifted with the second repetition appearing to require all of Mrs. Rettzo's energy. Following the knee to chest lift, Mrs Rettzo stated "it kills my back" and maxed out again at 14lbs in total. For all 3 lifts, her lifting technique was very poor, as was her grip and rotation with the weight, which can result in accumulative stress on the body toward the end of her lifts. Her pre and post heart rate reading were 98/104. 13lbs was carried using the left hand over 60 feet. Mrs Rettzo used her cane for support and walked slowly but demonstrated a ordinary gait. Other

than stating "it's getting heavy" there were no signs or reports of difficulty.

Mrs Rettzo used the railing for support for the 60 second climbing test. She was able to complete it with pre and post heart rate levels of 89/105. Following the activity, she had labored breathing and asked to sit.

It appears the damage to her L4 and possibly in combination with her hip replacements have severely limited Mrs Rettzo's lower body physical abilities. Having improper postural habits will only worsen the situation. Furthermore, from my observations and her performance, Mrs Rettzo's range of motion in her right shoulder is very good and it appeared to function very well when tested. Despite inconsistencies in Mrs Rettzo's dynamometry results both graphically and through coefficient of variation, overall a consistent effort was given and this report reflects her physical capabilities and what she can safely perform.

(Admin. Tr. 498-499).

The ALJ gave "little" weight to this EP Bahadoor's report. In doing so, he

explained:

The undersigned acknowledges that there is a functional capacity evaluation that was performed on the claimant on December 11, 2017. It indicates that the claimant could perform sedentary level work (Exhibit 5F). Despite agreeing with the conclusion, the undersigned gives little weight to the assessment because it was performed nearly 15 months after the expiration of the claimant's insured status.

(Admin. Tr. 59).

Plaintiff argues:

Dr. Mark Folk has treated Claimant on a regular basis since October 2012, or a period of approximately five (5) years as of the date of his completion of the Physical Residual Functional Capacity Questionnaire for Claimant. (Admin. Tr. 492-497). Dr. Folk set forth limitations that

would render Claimant unemployable, as follows: (1) frequent interference with the attention and concentration to perform even simple work tasks due to pain, with frequent as defined as 34% to 66% of the workday, (2) Claimant is incapable of even low stress jobs; (3) Claimant can only walk ½ city block at a time, (4) Claimant can only sit 2 hours out of an 8 hour work day, and a combined additional walking and standing of 2 hours out of an 8 hour work day, (5) Claimant must walk 5 minutes every 15 minutes, (6) Claimant will need to take several unscheduled breaks each hour of the work day, (7) Claimant must use a cane while walking and standing, (8) Claimant will miss work more than one day per week. (Admin. Tr. 492-497). These limitations were confirmed, in part, by the independent Functional Capacity Evaluation performed on December 11, 2017. (Admin Tr. 498-502). These opinions from treating sources were afforded little weight, without adequate explanation by the ALJ.

The ALJ noted the Physical RFC completed by Dr. Folk, and the limitations that would render her incapable of working, and then he afforded little weight to these opinions as he claimed that they were inconsistent with the record. (Admin. Tr. 58). The ALJ also gave little weight to the opinions of the State Agency Medical Consultant. (Admin. Tr. 58-59). The ALJ then noted the FCE, offered little analysis, assigned it little weight due to the date it was performed without noting that it was consistent with the opinion of treating source Dr. Folk, for a time period prior to the date last insured. (Admin. Tr. 59 and 498-502). In essence, the ALJ set forth an RFC which is not based upon findings from any competent medical source, but is based upon findings by the ALJ's own findings that replace those supported by treating sources and the actual medical evidence, as he determined that he was assigning little weight to essentially all opinions of record. (Admin. Tr. 55-59).

Based upon the above, the ALJ erred in failing to afford proper weight to the treating source opinions, and the FCE, and does not point to or reply upon competent medical evidence in setting forth Claimants' RFC.

(Doc. 12, pp. 19-24).

In response, the Commissioner argues:

Page 39 of 45

Here, Plaintiff relies on the medical opinion from Dr. Folk to establish his claim of error (Pl.'s Br. at 19-23). This reliance is misplace[d] because the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" *Sherman v. Colvin*, No. 3:15-CV-281, 2015 WL 4727298, at *13 (M.D. Pa. Aug. 10, 2015) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

Further, in evaluating the medical opinions of record, the ALJ reasonably accorded to opinion evidence the weight he deemed appropriate, based on factors such as whether the opinion was supported by the record as a whole. *See* 20 C.F.R. § 404.1527(c). The ALJ gave Dr. Folk's opinion little weight for five valid reasons. One, Dr. Folk only twice noted that Plaintiff had any problem walking and it was to say that Plaintiff had a slightly antalgic gait (Tr. 58, referring to Tr. 355, 366). Two, all other times, the record shows that during the period at issue from October 21, 2014 to September 30, 2016, Plaintiff's gait was normal and clinical findings negative (Tr. 58, referring to Tr. 351, 353, 374, 381, 383, 459, 478). Three, in Dr. Folk's most recent note prior to Plaintiff's insured status expiring, he stated that Plaintiff was "doing well" and he observed no abnormal findings (Tr. 58, referring to Tr. 380-81). Four, there was no evidence of any decline in Plaintiff's condition prior to the expiration of her insured status on September 30, 2016 (Tr. 58). Five, even in the month after Plaintiff's insured status expired, Dr. Folk observed nothing remarkable and reported that Plaintiff was still doing well with no new problems and a normal gait (Tr. 58, referring to Tr. 383).

In sum, Plaintiff appears to ask this Court to do exactly what the law forbids: reweigh the evidence and substitute the Court's judgment for that of the ALJ. *Monsour*, 806 F.2d at 1190. Such a request is not permissible; rather, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Craig*, 76 F.3d at 589. Thus, while Plaintiff may disagree with the ALJ's ultimate assessment, that does not mean that the ALJ's decision was erroneous or that Plaintiff can ask this Court to reweigh the evidence to arrive at a different conclusion. Because substantial evidence supports the ALJ's

assessment of the evidence, the Commissioner respectfully submits that
the ALJ's decision should be affirmed.

(Doc. 13, p. 21-23).

Although neither party cites to these cases, it appears that Plaintiff's argument

requires the Court to compare the language offered in two Third Circuit opinions:

*Chandler v. Comm'r of Soc. Sec.* 667 F.3d 356 (3d Cir. 2012), and *Doak v. Heckler*,

790 F.2d 26 (3d Cir. 1986). Plaintiff appears to argue that the ALJ's decision is not

supported by substantial evidence because he discounted all medical opinions and

arrived at an RFC assessment in between the two competing medical opinions from

Doctors Shaw and Folk. The ALJ gave little weight to Dr. Shaw's opinion because,

relying on Plaintiff's testimony, he concluded Plaintiff was *more* limited than Dr.

Shaw assessed. The ALJ gave little weight to Dr. Folk's opinion because he found,

based on the objective findings in treatment records, that Plaintiff was not as limited

as Dr. Folk assessed.

Plaintiff is correct that an RFC assessment is not supported by substantial

evidence where an ALJ assesses a lesser degree of limitation than found by any

medical professional without citing to another type of evidence that supports his or

her assessment. *Decker v. Berryhill*, No. 1:17-cv-00945, 2018 WL 4189662 at *6

(M.D. Pa. June 8, 2018) *report and recommendation adopted* 2018 WL 4184304

(M.D. Pa. Aug. 31, 2018). However, that is not what occurred here. Dr. Shaw

assessed, based on medical records from the relevant period, that Plaintiff was capable of a range if "light" work. Dr. Folk assessed that Plaintiff was not even capable of engaging in sedentary work. The ALJ, considering Plaintiff's testimony and objective evidence (some of which may not have been available to either source) concluded that Plaintiff could do more than was assessed by Dr. Folk, but less than what was assessed by Dr. Shaw. "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC. Surveying the medical evidence to craft an RFC is part of the ALJ's duties." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). In this case, the ALJ did exactly that. Accordingly, I am not persuaded that remand is required for further evaluation of the medical opinions of record.

E.    WHETHER THE ALJ PROPERLY ADDRESSED PLAINTIFF'S USE OF A CANE

A claimant's use of a cane need not be incorporated in an ALJ's RFC assessment unless that cane is medically required. SSR 96-9p explains that:

> To find that a hand-held assistive device is medically required, there must be *medical documentation* establishing the need for an hand-held assistive device to aid in walking or standing, *and* describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other information).

1996 WL 374185 at *7 (emphasis added). With respect to cane use, the ALJ noted

that "[t]he claimant was using a cane at the hearing; she testified that it had not been

prescribed by a doctor, but made it easier to walk." (Admin. Tr. 57).

> Plaintiff argues:
>
> As it relates to the use of a cane, Claimant testified that she has used it for about two years (including prior to the date last insured) to walk and to balance when standing, using her dominant right hand. (Admin. Tr. 145-147, 155). In fact, Claimant testified that she started using the cane after she stopped working, which would have been prior to the amended alleged onset date of October 21, 2014. (Admin. Tr. 150). Claimant also noted that she used a walker and wheelchair at times after her various hip surgeries. (Admin. Tr. 272). According to the VE, this use of Claimant's dominant hand, as it relates to standing or walking with the cane, would eliminate all employment, even at the sedentary exertional level. (Admin. Tr. 164).

(Doc. 12, p. 24).

> In response, the Commissioner argues:
>
> Moving to Plaintiff's claim that her cane causes limitations that require accommodation in the ALJ's RFC (Pl.'s Br. at 24), the record again does not support this allegation. Plaintiff specifically testified that no doctor even prescribed one for Plaintiff (Tr. 145), which is consistent with the medical evidence discussed above about her gait and relief from treatment.

(Doc. 13, p. 19).

The only evidence cited by Plaintiff to support her position that her use of a

cane was medically necessary and should be incorporated in the RFC assessment is

her own testimony. She did not point to any medical documentation establishing the

need for a cane, or any medical documentation describing the circumstances in which the cane is needed. Plaintiff's statements are not enough to establish medically necessity under SSR 96-9p. *See Williams v. Colvin,* No. 3:13-CV-2158, 2014 WL 4918469 at *10-11 (M.D. Pa. Sept. 30, 2014) (finding that a claimant's testimony about use of a cane did not satisfy SSR 96-9p's direction that "medical documentation" is required to show medical necessity); *Dyer v. Colvin,* No. 3:14-CV-1962, 2015 WL 3953135 at *18 (M.D. Pa. June 29, 2015) (finding that a claimant's testimony that a cane was prescribed by a Certified Physician Assistant and objective records noting that the claimant was using a cane are insufficient to show medical necessity under SSR 96-9p); and *Schade v. Colvin*, 13-1071, 2014 WL 320133 at *8-9 (W.D. Pa. Jan. 29, 2014) (finding an ALJ did not err by excluding cane use from an RFC assessment where there was no medical documentation establishing the need for a hand-held assistive device). Accordingly, I am not persuaded that the ALJ erred by excluding cane use from the RFC assessment.

[The following page contains the Conclusion]

V.    CONCLUSION

IT IS ORDERED that Plaintiff's request for request that the ALJ's decision

be vacated is Denied as follows:

(1) The final decision of the Commissioner is AFFIRMED.

(2) An appropriate Order shall issue.

Date: October 13, 2020                         BY THE COURT

                                               *s/William I. Arbuckle*
                                               William I. Arbuckle
                                               U.S. Magistrate Judge